United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Maria Dolores Canto Marti, and others, Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| Iberostar Hoteles y Apartamentos S.L., and Marcaribe International-Turismo S.L., Defendants. | ) ) ) |

Civil Action No. 20-20078-Civ-Scola

## Order on Motions to Dismiss

Previously, the Court granted Defendants' Marcaribe International-Turismo S.L. ("Marcaribe") and Iberostar Hoteles y Apartamentos, S.L. ("Iberostar") joint motion to dismiss (Defs.' Mot., ECF No. 172), but only to the extent that Iberostar had not been properly served. Thus, the motion has remained pending with respect to Marcaribe. (Order on Mot. to Dismiss, ECF No. 179; Order on Mot. for Reconsideration, ECF No. 184.) After Iberostar was re-served, Iberostar renewed its motion to dismiss with similar arguments. (Iberostar's Mot., ECF No. 193.) The Plaintiffs have responded in opposition (Resps., ECF Nos. 174, 198), and the Defendants have timely replied in support of their motions (Replies, ECF Nos. 175, 199).

Thus, before the Court are the two motions to dismiss. The Court has considered the briefing, the record, the relevant authorities, and is otherwise fully advised. For the reasons that follow, the Court **denies** the motions to dismiss (**ECF Nos. 172, 193**).

### 1. Background

### A. Factual Background

Maria Solores Canto Marti originally filed her complaint on January 8, 2020, as the personal representative of the estates of Dolores Marti Mercade and Fernando Canto Bory. (Compl., ECF No. 1, at 1.) She sought relief for the two estates under Title III of the Helms-Burton Act ("Helms-Burton," 22 U.S.C. §§ 6021, et seq.). (*Id.* ¶ 1.) Marti's original complaint alleged Iberostar (who was the only defendant at the time), had wrongfully trafficked in real property that had been confiscated by the Cuban government. (*Id.* ¶ 14, 30.) Marti alleged that the estates had inherited their fathers' interests to certain real property

that included "a hotel named 'El Imperial'" and a department store called "La Francia department store." (*Id.* ¶¶ 11-12.) Marti alleged that Iberostar trafficked in the property after confiscation by "co-operating and co-managing the Iberostar Imperial Hotel in conjunction with the Cuban government" on the confiscated property. (*Id.* ¶ 30.)

The operative complaint before the Court is the Fourth Amended Complaint. ("FAC," ECF No. 163.) The complaint raises essentially the same Helms-Burton claim relating to the same property in Cuba, but now Marti asserts the claim in her own name and is also joined by five additional Plaintiffs asserting the same claim against Iberostar as well as Marcaribe. The new Plaintiffs are Maria Dolores Canto Marti (personally), Fernando Jose Ignacio Canto Marti, Javier Enrique Canto Marti, Graciela Maria Canto Marti, Roberto Jose Canto Marti, and Enrique Canto Marti. (FAC ¶¶ 2-7.) All are United States citizens. (*Id.*)

Marcaribe is a Spanish limited liability company wholly owned by Iberostar. (*Id.* ¶ 14.) During the relevant time period of the alleged trafficking, (from January 1, 2017 through and including January 8, 2020), Marcaribe entered into an agreement with the Cuban government (specifically a tourism entity known as "Cubanacan") for the administration of the Imperial Hotel. (*Id.* ¶ 15; ¶ 15 n.2.)

The Plaintiffs allege that in March 1909, Fernando Canto Granda acquired the real property at issue in this case (the "subject property"), and began developing a building on the property that, in 1916, housed the Hotel Imperial and La Francia department store. (*Id.* ¶¶ 93-94.) Eventually, Granda's cousin, similarly named Fernando Granda Canto, acquired an interest in La Francia. (*Id.* ¶ 95.)

Fernando Canto Granda was married to Dolores Bory Trillas. (*Id.* ¶ 96.) They died intestate in Cuba on October 21, 1941 and December 1970, respectively, leaving one-fourth interest in the subject property to each of their children/heirs, Fernando Canto Bory, Enrique Canto Bory, Rosa Canto Bory, and Dolores Canto Bory. (*Id.* ¶ 96.) Eventually, Fernando Canto Bory and Enrique Canto Bory purchased the interest of the two other heirs (their sisters) and Fernando Granda Canto in La Francia. (*Id.* ¶ 97.) Enrique Canto Bory died intestate, with no spouse or descendants. in Puerto Rico on January 8, 1982. (*Id.* ¶ 102.) By operation of Puerto Rican law, his interest in the subject property were inherited by his two living siblings, Fernando Canto Bory and Rosa Canto Bory. (*Id.* ¶ 102.) Fernando Canto Bory died intestate in Puerto Rico in 1992, with his seven children and his spouse receiving his interests in the subject property. (*Id.* ¶¶ 105-06.)

On December 28, 1961, the Cuban government took over the subject property by force. (*Id.* ¶¶ 98, 104.) This followed a series of Cuban laws in which the Cuban government nationalized, expropriated, and seized ownership and control of certain private property. (*Id.* ¶ 103.) At that time, the Hotel Imperial was operated by the Higuera family, who paid rent to the Canto Bory family. (*Id.* ¶¶ 99-100.)

The Plaintiffs allege that since the confiscation, the Cuban government has operated and managed the Imperial Hotel on the subject property. (*Id.* ¶ 120.) By 2017, Iberostar, Marcaribe, and two other entities (Portal and Visit, which are discussed below), began managing and operating the Imperial Hotel, which carried the Iberostar brand between 2017 and 2019. (*Id.* ¶ 121.) The Plaintiffs allege that they never granted Iberostar, or anyone else, permission to traffic in the subject property, and "have never received . . . compensation for Ibertostar and/or its agents' trafficking in the confiscated Subject Property." (*Id.* ¶¶ 142-43.) The Plaintiffs allege that the Defendants had notice of their trafficking through the series of Cuban laws published in the Cuban newspaper the Gazette, as well as through Maria Canto's notification to Iberostar under the Helms Burton Act that it was trafficking in the subject property. (*Id.* ¶¶ 145-46.) Despite this notice, Iberostar continued to traffic in the subject property. (*Id.* ¶ 147.)

Based on the foregoing, the Plaintiffs bring one count of trafficking in confiscated property against the Defendants under the Helms-Burton Act, 22 U.S.C. §§ 6021, et seq.

## B. Background of Various Entities

At issue in these motions to dismiss are various entities with alleged relationships to the Defendants and each other. "As the manager of the Iberostar Imperial Hotel . . . Marcaribe entered into several 'collaboration contracts' with wholly owned subsidiaries of Iberostar for the purpose of managing the" Imperial. (*Id.* ¶ 26; *see also* ¶¶ 26-33.) These collaboration contracts allowed the subsidiaries, Portal Interactiv, S.L. ("Portal") and LaIsla Oversea, S.L.U. "to lease and reserve the hotels listed in the agreement," including the Imperial. (*Id.* ¶ 27.) Visit US, Inc. ("Visit,") a wholly owned subsidiary of Iberostar, entered into an agreement with Iberostar in July of 2019 "for the license and use of Iberostar owned trademarks." (*Id.* ¶ 33.)

Additionally, the Plaintiffs allege that Marcaribe entered into various agreements with online booking providers, including Expedia. (*Id.* ¶ 80.) Expedia agreed to "provide room booking services" for the Imperial, as well as "market and advertise the Iberostar Imperial Hotel." (*Id.* ¶ 80.) Through

Expedia, twenty-six United States residents booked stays at the Imperial. (*Id.* ¶ 81.)

### C. Procedural Background

Given this case's long procedural history, the Court will only discuss the history relevant to this motion. On April 7, 2020, the Plaintiff served Iberostar and on April 23, 2020, Iberostar filed a motion to stay the case on the grounds that European Commission Regulation 2271/96 prohibited Iberostar from responding to the complaint without express authorization from the Commission. (ECF No. 16, at 1-2.) The Court granted the stay on April 24, 2020. (ECF No. 17.) This stay remained in place until December 21, 2022, after the stay was vacated by the Eleventh Circuit. (ECF Nos. 66, 67.) Since then, the Plaintiffs have taken jurisdictional discovery to determine whether the Court has personal jurisdiction over the Defendants.

On October 8, 2024, the Court granted the parties' motion to dismiss on the basis that the Plaintiffs had not properly served Iberostar. (Order Granting Mot. to Dismiss, ECF No. 179.) On October 16, 2024, the Court clarified that the motion to dismiss was effective only as to Iberostar and not Marcaribe. (Order Granting Mot. for Reconsideration, ECF No. 184.) Thus, the motion to dismiss (ECF No. 172) remained pending as to Marcaribe.

Given the Court's order, the Plaintiffs moved for alternative service of process pursuant to Fed. R. Civ. P. 4(f)(3). (ECF No. 185.) On November 8, 2024, the Court granted that motion, allowing for service of process via e-mail to Iberostar's general counsel and its outside counsel. (Order Granting Mot. for Alt. Service of Process, ECF No. 191.) The Plaintiffs subsequently served Iberostar consistent with the Court's order. (Notice of Filing, ECF No. 192.)

Iberostar then filed its motion to dismiss with prejudice (ECF No. 193). Combined with the previous motion to dismiss, the Defendants seek to dismiss the Plaintiffs' FAC for lack of personal jurisdiction, improper amendment of the complaint, statute of limitations, and failure to state a claim. Iberostar additionally seeks dismissal again for improper service of process.

### 2. Legal Standard

### A. Motion to Dismiss for Lack of Personal Jurisdiction

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). A defendant challenging

personal jurisdiction must present evidence to counter the plaintiff's allegations. *Internet Sols. Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009). Once the defendant has presented sufficient evidence, "the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents." *Id.*; *Exist, Inc. v. Woodland Trading Inc.*, No. 14-61354-CIV, 2015 WL 881407, at *1 (S.D. Fla. Mar. 2, 2015). "If the parties' evidence conflicts, a court must resolve inconsistencies in favor of the plaintiff." *Exist, Inc.*, 2015 WL 881407, at *1 (citing *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990)).

### B. Motion to Dismiss for Failure to State a Claim

A court considering a motion to dismiss, filed under Federal Rule of Civil Procedure 12(b)(6), must accept all of the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). Although a pleading need only contain a short and plain statement of the claim showing that the pleader is entitled to relief, a plaintiff must nevertheless articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)) (cleaned up). A court must dismiss a plaintiff's claims if she fails to nudge her "claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### 3. Discussion

For the reasons discussed below, the Court finds that it has specific personal jurisdiction over the Defendants. Additionally, the Court concludes that the Plaintiffs properly served Iberostar with the FAC; the Plaintiffs' claims are not-time barred; the Plaintiffs properly amended their complaint; and that the Plaintiffs have stated a claim upon which relief may be granted. Therefore, the Defendants' motions to dismiss are denied in full.

### A. Personal Jurisdiction

"A federal district court in Florida may exercise personal jurisdiction over a nonresident defendant to the same extent that a Florida court may, so long as the exercise is consistent with federal due process requirements." *Fraser v. Smith*, 594 F.3d 842, 846 (11th Cir. 2010) (citation omitted). Accordingly, this

Court has jurisdiction over a defendant if (1) jurisdiction is authorized by Florida's "long-arm" statute; and (2) the exercise of jurisdiction over the defendant does not violate the Fourteenth Amendment's Due Process Clause. *See Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d, 1312, 1319 (11th Cir. 2004); *High Tech Pet Products, Inc. v. Shenzhen Jianfeng Elec. Pet Prod. Co.*, No. 6:14-CV-759-ORL-22, 2015 WL 926048, at *2 (M.D. Fla. Feb. 12, 2015), *report and recommendation adopted,* No. 6:14-CV-759-ORL-22TB, 2015 WL 926023 (M.D. Fla. Mar. 4, 2015).

The Florida legislature lists Florida's long-arm statute at Fla. Stat. Ann. § 48.193(1)(a), subsections one through nine. "The Due Process Clause imposes a more restrictive requirement than does Florida's Long-Arm Statute." *Melgarejo v. Pycsa Panama, S.A.*, 537 F. App'x 852, 860 (11th Cir. 2013). Therefore, "[t]he mere proof of any one of the several circumstances enumerated in section 48.193 as the basis for obtaining jurisdiction of nonresidents does not automatically satisfy the due process requirement of minimum contacts." *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989) (citing *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310 (1945)). So, a court must conduct an independent constitutional due process analysis should it find that Florida's long-arm statute is satisfied.

### 1.  Relevant Contacts

Before the Court analyzes whether it can exercise specific personal jurisdiction over Iberostar and Marcaribe, it must first determine whose contacts are relevant to its analysis. The Plaintiffs believe various entities' contacts—specifically, Portal, LaIsla, Visit, and Expedia—are the Defendants' agents, and as such their contacts should be imputed to Iberostar and Marcaribe. (Pls.' Resp., at 4-9.)[1] The Plaintiffs also believe that Marcaribe and Iberostar's contacts should be imputed to one another. (*Id.*)

The Defendants disagree and believe that an agent's contacts with a forum state may only be imputed to that of the parent when the parent has day-to-day operational control over its agent. (Defs.' Mot., at 19.) They also argue that cases like *Meier v. Sun International Hotels, Ltd.*, 288 F.3d 1264 (11th Cir. 2002), in which the Eleventh Circuit used a more flexible standard in

---

[1] The arguments presented by Iberostar in its own motion to dismiss are nearly identical to those presented in the previous joint motion to dismiss. Moreover, the Plaintiffs' response to Iberostar's motion to dismiss incorporate by reference its response to the joint motion to dismiss. Therefore, citations to the briefings refer to the briefings with respect to the joint motion to dismiss unless otherwise noted.

determining agency personal jurisdiction—by analyzing whether an alleged agent had no other purpose but to work on behalf of the alleged parent—have been abrogated by the "stricter" approach adopted by the Supreme Court in *Daimler AG v. Bauman*, 571 U.S. 117 (2014). (Defs.' Reply, at 5.)

However, in 2021—after *Daimler* was decided—the Eleventh Circuit relied, in part, on *Meier* in a specific personal jurisdiction case and concluded that *Meier* was "binding." *See United States ex rel. v. Mort. Inv'r Corp.*, 987 F. 3d 1340, 1355 (11th Cir. 2021). Thus, *Meier* is still good law in the Eleventh Circuit.[2]

The Defendants' view of agency-based jurisdiction is also overly narrow. "Agency-based personal jurisdiction also exists where the subsidiary has no independent purpose for existence but rather conducts business solely for the parent." *Hard Candy, LLC v. Hard Candy Fitness, LLC*, 106 F. Supp. 3d 1231, 1241 (S.D. Fla. 2015) (Altonaga, J.). The Defendants cite to this Court's opinion in *L.H. v. Marriot International*, 604 F. Supp. 3d 1346, 1357 (S.D. Fla. 2022), for the proposition that "the facts must show a high degree of control *and* that corporate formalities were ignored." (Defs.' Mot., at 13 (emphasis in original).) But this Court in *Marriot* specifically said this was an "example" of when agency-based jurisdiction is justified. *See Marriot Int'l*, 604 F. Supp. at 1357. As the Eleventh Circuit explained in *Mortgage Investors*, *Meier* is based "on the rationale that when a defendant exerts a high degree of control over an entity, the contacts created by the entity are, in reality, created by the defendant." *Mort. Invs. Corp.*, 987 F. 3d at 1355. "[W]here the apparent forum contacts of one actor are really the forum contacts of another, it is consistent with due process to impute those contacts for personal jurisdiction purposes." *Id.* And in *Meier*, the Eleventh Circuit explained that are were two instances where a subsidiary's contacts could be imputed to the parent when evaluating personal jurisdiction: where "[1] the subsidiary is merely an agent through which the parent company conducts business in a particular jurisdiction *or* [2] its separate corporate status is formal only and without any semblance of individual identity." *Meier*, 228 F.3d at 1272 (emphasis added).

Applying these principles here, the Court finds that the evidence demonstrates that the various entities—with the exception of Expedia, as explained further below—were entities merely "through which [Iberostar] conduct[ed]" its business in the "particular jurisdiction[s]" of Florida, the

---

[2] *Daimler* involved general, rather than specific, jurisdiction. In such cases, a stricter approach to agency-based theories of jurisdiction perhaps makes more sense given that general jurisdiction subjects an entity or individual to all suits in the forum state, regardless of a suit's relation to that state.

United States, and Cuba, *id.*, and "ha[d] no independent purpose for existence" other than "conducting business solely for" Iberostar. *See Hard Candy*, 106 F. Supp. 3d at 1241. To conclude otherwise would, in effect, allow Iberostar to hide behind corporate machinations to avoid this Court's jurisdiction.

Iberostar concedes that Visit is its subsidiary and that Portal "operates iberostar.com's booking platform and the call center in Spain receiving calls from prospective customers seeking information or reservations for hotels in Cuba." (Defs.' Mot., at 16.) Moreover, the Defendants do not dispute that Iberostar is the sole owner of Portal and LaIsla. (*Id.* at 29.) The Defendants do argue, however, that the Plaintiffs' arguments that: (1) this ownership; (2) Iberostar's granting to Visit and Portal a license to use Iberostar's trademarks; and (3) Visit and Portal's operation of iberostar.com are insufficient for those agencies' contacts to be imputed to Iberostar and Marcaribe. (*Id.* at 29.)

The Court disagrees. The Plaintiffs' allegations that "the Iberostar Subsidiaries exist only to serve Iberostar" in the relevant jurisdictions have evidentiary support. (Pls.' Resp., at 23.) For example, the web of Iberostar's various agreements with its subsidiaries and related entities support the Plaintiffs' allegations that these subsidiaries and entities enabled Iberostar to operate the Imperial in Cuba and advertise and accept bookings thereto from places in the United States, including Florida.

Marcaribe's corporate representative confirmed that it does not have its own hotels in Cuba. (Pl.'s Resp., ECF No. 174-5 at 6 (Fernandez Dep. 17:6-10).) Rather, Marcaribe, as an entity fully owned by Iberostar, only manages hotels in Cuba (including the Imperial) with the Iberostar brand. (*Id.*) As the Plaintiffs allege in the FAC—an allegation supported by an exhibit—Iberostar, pursuant to a marketing agreement, provided the marketing and advertising for the Marcaribe-managed hotels in Cuba (including the Imperial). (FAC ¶ 19 (citing ECF No. 163-2 at 2).) The same marketing agreement provided that Iberostar would market Marcaribe's Cuban hotels on iberostar.com. (*Id.* ¶ 20.) Iberostar—by its own admission—authorized and/or licensed iberostar.com "to Portal to operate the website and market bookings in Cuba, among other places." (Defs.' Mot., at 21.) Specifically, Portal was "licensed . . . to sell the hotel Iberostar Imperial." (Defs.' Mot., ECF No. 172-3 at 10 (Llompart Dep. 65:10-13.) Iberostar "authorized" Portal to use its website. (*Id.* 57:10-13.) Additionally, Visit—who again, also operates iberostar.com as well as Iberostar's call center in Spain—confirmed through its corporate representative that it "sell[s] the hotel rooms for Iberostar in Mexico, Dominican Republic,

Brazil and Jamaica." (Pls.' Resp., ECF No. 174-3 at 5 (Garcia Dep. 13:7-9).)[3] Visit's corporate representative also confirmed that its *only business* is to sell hotel rooms for Iberostar. (*Id.* at 13:18-20.)

Similarly, LaIsla is a 100% wholly owned subsidiary of Iberostar, and "sold to potential hotel guests Iberostar branded hotels in Cuba and maintained booking data for certain reservations at the Iberostar Imperial Hotel." (FAC ¶ 75.) Marcaribe (again, another wholly owned subsidiary of Iberostar) entered into agreements with LaIsla for this purpose. (*Id.* ¶¶ 27, 31 (citing ECF No. 163-9 at 4).)

The Court thus concludes that for jurisdictional purposes: Portal, LaIsla and Visit's contacts are imputed to Iberostar and Marcaribe, and Marcaribe's contacts are imputed to Iberostar. The Defendants' arguments and case law to the contrary are unavailing. For example, *Riad v. Porsche Cars North America, Inc.*, 657 F. Supp. 695 (E.D. Pa. 2023), is inapposite. There, the district court did not impute the contacts of Porsche NA to Porsche AG where the existence of one contract between the two entities only showed that the entities "interact[ed] with each other pursuant to an arm's length, written contract." *Riad*, 657 F. Supp. at 702. While that may be true for the Defendants' contracts with Expedia, in which the Defendants contracted with Expedia (as an entity not affiliated or owned by the Defendants) to provide room booking services, that is not the case vis-à-vis each other and the other entities. Marcaribe entered into at least six "collaboration contracts" with Portal and LaIsla that allowed Portal and LaIsla "to lease and reserve the hotels listed in the agreement," including the Imperial. (FAC ¶¶ 27-31.) The various agreements between the various subsidiaries of Iberostar present a more complex and deliberate scheme than the one "arm's length, written agreement" found in *Riad*. *See Riad*, 657 F. Supp. 3d at 702.

The Defendants also argue that these collaboration contracts were entered into between LaIsla and Portal and Cubanacan, and Marcaribe was only acting as Cubanacan's legal representative in signing the contract. (Defs.' Mot., at 22.) But this only supports the conclusion that the Iberostar entities were working on Iberostar' behalf to carry on its business at the Imperial.

Finally, the Defendants argue that agency jurisdiction does not exist because one of the contracts between Marcaribe and Portal expressly disclaims the presence of an agency relationship. (*Id.* at 30.) However, such language "alone is not dispositive," *Taylor Group, Inc. v. Industrial Distributors*

---

[3] As discussed *infra supra* 3.A.2., the Plaintiffs have provided evidence that Visit, in fact, marketed the Imperial in the United States through iberostar.com.

*International Company*, 506 F. Supp. 3d 1256, 1270 (S.D. Fla. 2020) (Becerra, J.), and does not outweigh the other evidence discussed above.

With the relevant contacts settled, the Court proceeds to its personal jurisdiction analysis.

### 2. Florida's Long-Arm Statute

Section 48.193(1)(a)(2) of Florida's long-arm statute "provides that a nonresident defendant is subject to personal jurisdiction for any cause of action 'arising from' a 'tortious act' committed in Florida." *Del Valle v. Trivago GMBH*, 56 F. 4th 1265, 1272 (11th Cir. 2022) (citation omitted). Because "a nonresident defendant commits a tortious act in Florida by performing an act outside the state that causes injury within Florida," "[a] nonresident defendant need not be physically present in Florida to commit a tortious act there." *Id.* (citations omitted). Under certain circumstances, a defendant's provision of a website to sell goods or products in Florida satisfies § 48.193(1)(a)(2). *See, e.g.*, *id.*; *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1354 (11th Cir. 2013).

In *Del Valle*, the Eleventh Circuit applied § 48.193(1)(a)(2) of the Florida long-arm statute to a website-based Helms-Burton Act claim. There, the Eleventh Circuit found the long-arm statute satisfied where the defendants "allegedly trafficked in the confiscated properties by profiting from web traffic generated by Florida residents' interest in the Resorts" as well as Florida residents' reservations through their websites. *Del Valle*, 56 F. 4th at 1274. The Eleventh Circuit explained that "[i]t is the Florida residents' booking of accommodations at the Resorts through the websites—the material communicated 'into' Florida—that" was the basis of the plaintiffs' claims and satisfied § 48.193(1)(a)(2). *Id.*

Here, the parties disagree on *Del Valle*'s applicability. The Defendants believe that it was "critical [in *Del Valle*] that a *Florida resident* made these reservations for jurisdictional purposes." (Defs'. Reply, at 2 (emphasis in original); *see also* Defs.' Mot., at 12).) The Plaintiffs do not think that Florida residency is required under *Del Valle* and that "the Eleventh Circuit was describing the facts before it." (Pl.'s Resp., at 14 n.29.) To the Plaintiffs, "it is the tortious communication of material entering Florida (i.e., trafficking) that satisfies [the] long-arm" statute. (*Id.* at 14.)

The Court agrees with the Plaintiffs. When the alleged tortious conduct at issue involves the use of a website, whether the conduct had an effect on a Florida resident is not dispositive. Rather, the relevant analysis is whether —as the plain language of § 48.192(1)(a)(2) says—the tortious act was committed

"within" the state. *See* § 48.192(1)(a)(2). Though in *Del Valle* it was "the Florida residents'" use of the website that satisfied Florida's long-arm statute, *see Del Valle*, 56 F. 4th at 1274, nowhere in *Del Valle* did the Eleventh Circuit hold that Florida residency is *required* under the statute. Again, the relevant analysis was whether "an act outside the state [] cause[d] injury *within* Florida." *Id.* (citation omitted) (emphasis added). The Court relied in part on the Florida Supreme Court's decision in *Internet Solutions Corporation v. Marshall*, 39 So.3d 1201, 1211 (Fla. 2010), which "held that a nonresident defendant commits a tortious act in Florida under § 48.193(1)(a)(2) when he 'posts allegedly defamatory statements on a website, provided that the website posts containing the statements are accessible in Florida *and accessed in Florida*." *Del* Valle, 56 F.4th at 1273-74 (quoting *Internet Solutions,* 39 So. 3d at 1215) (cleaned up and emphasis in *Del Valle*). According to the Eleventh Circuit in *Del Valle*, *Internet Solutions* stands for the proposition that "[o]nce defamatory material is 'accessed by a third party in Florida, the material has been 'published' in Florida and the poster has communicated the material 'into' Florida, thereby committing the tortious act of defamation within Florida.'" *Del* Valle, 56 F.4th at 1274 (citation omitted). That *Internet Solutions* involved a Florida plaintiff was thus not central to the Florida Supreme Court's holding; what was relevant was whether the material was "accessed in Florida." *See id.* (citation omitted).

The Plaintiffs believe Florida's long-arm statute is satisfied because three reservations at the Imperial Hotel were made by either one or multiple Swiss nationals while located in Florida during the relevant time period. (Pls.' Resp., at 4-5.) The Plaintiffs explain that because Iberostar is the owner of iberostar.com and its agent, LaIsla, processed the booking, Florida's long-arm statute with respect to Iberostar is satisfied. (*Id.* at 5.) The Plaintiffs also believe that the statute is satisfied with respect to Marcaribe because Iberostar agreed to market Marcaribe's hotels, including the Imperial. (*Id.*) And like Iberostar, Marcaribe allowed LaIsla, as its agent, to accept reservations at the Imperial. (*Id.*)

Additionally, the Plaintiffs point out that 485 U.S. residents stayed at the Imperial during the relevant time period, including 17 Florida residents. (*Id.* at 7.) The Plaintiffs believe that the number of Florida residents who made reservations is indeed much more, reasoning that the Defendants only kept the state of residence for twenty-five of the 485 U.S. residents, and 68% of these (the 17) were from Florida. (*Id.*). Thus, the Plaintiffs argue that "there is a strong likelihood that a substantial number of the remaining 460 guests . . . were Florida residents." (*Id.*) According to the Plaintiffs, there is "at the very least [] an issue of fact, requiring an evidentiary hearing" that ~~Defendants~~

"marketed and sold reservations at the Iberostar Imperial Hotel during the [relevant time period] to Florida residents through Iberostar.com or otherwise." (*Id.*) They also argue that there is "at least an issue of fact . . . as to whether Defendants were complicit in the alleged promotional efforts of Cubanacan and the tour operators," who "surely" marketed and sold reservations at the Imperial "to Florida residents via the internet or otherwise." (*Id.*)

The Defendants argue that the Florida long-arm statute is not satisfied, for several reasons. First, an Iberostar Spain subsidiary (Visit), and not Iberostar Spain, manages and operates iberostar.com. (Defs.' Mot., at 12-13.) Second, during the relevant time period, "the Hotel Imperial did not receive any reservation from Florida residents through iberostar.com." (*Id.* at 13.) Third, neither Iberostar Spain nor Marcaribe targeted Florida with respect to the Imperial. (*Id.*) Fourth, neither Iberostar nor Marcaribe ever profited from Hotel Imperial. (*Id.*) Fifth, the Defendants argue that jurisdictional discovery has only shown that a Florida IP address was used for the three referenced bookings, which is not evidence "that the reservations were actually made by the Swiss resident while in Florida." (Defs.' Reply at 1-2).

The Court finds many of these arguments irrelevant in determining whether Florida's long-arm statute has been satisfied. Under *Del Valle,* the three bookings made by either one or multiple Swiss nationals in Florida satisfies the Florida long-arm statute. As this Court has explained, Visit's contacts with respect to iberostar.com are imputed to Iberostar and Marcaribe. Though the Defendants argue that there is no evidence that the bookings made with a Florida IP address were made in Florida, that such bookings were indisputably made with a Florida IP is sufficient evidence that the bookings were made there. *See Exist, Inc.*, 2015 WL 881407, at *1 ("If the parties evidence conflicts, a court must resolve inconsistencies in favor of the plaintiff." (citation omitted)). Thus, the Florida bookings made through the iberostar.com website is the "the material communicated 'into' Florida [] that gives rise to the plaintiffs' trafficking claims under Title III and provides for specific jurisdiction under § 48.193(1)(a)(2)." *Del Valle,* 56 F. 4th at 1274.

### 3. Constitutional Due Process

Subjecting the Defendants to suit must still comport with constitutional due process. *Del Valle,* 56 F.4th at 1274. Specifically, the Defendants must "ha[ve] such contacts with the forum that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and does not offend traditional notions of fair play and substantial justice.'" *Id.* (quoting *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021)). For the Court to have specific personal jurisdiction, "[t]he plaintiff's claims . . . must

arise out of or relate to the defendant's contacts' with the forum." *Ford Motor Co.*, 592 U.S. at 359 (citation omitted).

The Eleventh Circuit has laid out a three-part test for specific jurisdiction: "whether (1) the plaintiff's claims 'arise out of or relate to' one of the defendant's contacts with the forum state; (2) the nonresident defendant 'purposefully availed' itself of the privilege of conducting activities within the forum state; and (3) the exercise of personal jurisdiction is in accordance with traditional notions of 'fair play and substantial justice.'" *Del Valle*, 56 F.4th at 1275 (citation omitted). Should the plaintiff carry the burden on the first two prongs, the defendant must then make a "compelling case" that the third prong is not met in order to avoid jurisdiction. *Id.* (citation omitted).

"The first prong—which addresses the concept of relatedness—focuses on the 'casual relationship between the defendant, the forum, and the litigation.'" *Id.* (citation omitted). However, direct causation is not required. *Id.* Here, "the plaintiffs' Helms-Burton Act claims arise at least in part directly out of the contacts" of the Defendants with Florida. *See id.* As discussed *supra* 3.A.2, this prong is met: the Plaintiffs have shown that at least three reservations were made in Florida.

The second prong, which "concerns purposeful availment," can be met using one of two tests: "the effects test [or] the minimum contacts test." *Id.* (citations omitted).

"Under the effects test, a nonresident defendant's single tortious act can establish purposeful availment without regard to whether the defendant had any other contacts with the forum state." *Id.* (citation omitted). The test is satisfied "when the tort was intentional, aimed at the forum state, and caused harm that the defendant should have anticipated would be suffered in the forum state." *Id.* (citation omitted).

The minimum contacts test, on the other hand, focuses on the defendant's contacts with the forum state and analyzes "whether those contacts (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Id.* Notably, "the nonresident's contact with the forum need not give rise to the plaintiff's claim." *Id.* (citing *Ford Motor Co.*, 141 S.Ct. at 362-63). Rather, the contacts must at the very least "relate to" the plaintiff's claim. *Ford Motor Co.*, 141 S.Ct. at 362.

The Plaintiffs argue that the effects and minimum contacts tests are met here because "[t]he solicitation and acceptance of the <u>three</u> bookings from Florida via iberostar.com were clearly intentional, aimed at the United States (including Florida), and caused harm in Florida (i.e., via the tortious

communication into Florida—the trafficking)." (Pls.' Resp., at 9 (emphasis in original).) They also note that "the stays of at least 17 Florida residents [sic] guests during the [relevant time period]" and the "reasonably derived 329 Florida resident guests" "is in and of itself evidence that Defendants' contacts with the Florida guests were intentional, aimed at Florida, and caused harm in Florida that the Defendants should have anticipated." (*Id.*) Finally, the Plaintiffs state that the effect of the Defendants' conduct was felt in Florida due to the Plaintiffs' residency in Florida and that the Defendants received a financial benefit from the bookings made by hotel guests. (*Id.* at 9-10 (citing *Del Valle*, 56 F.4th at 1276).)

The Plaintiffs also point to the fact that Visit is incorporated in Florida; has a Florida office; and operates iberostar.com. (Pls.' Resp., at 8.) The Plaintiffs argue that "Visit marketed Iberostar hotels throughout the Caribbean to the U.S., including to Floridians, which is why, in part, U.S. residents, including Floridians, were familiar with the Iberostar brand." (*Id.* at 23.) The Plaintiffs also note that iberostar.com contained a general legal notice which stated that Iberostar agreed to jurisdiction to the "Courts of Doral, Florida" for bookings made by non-United States residents. (*Id.*) The Plaintiffs also believe that this general legal notice constitutes a waiver of personal jurisdiction. (*Id.*)

In objecting to personal jurisdiction, the Defendants argue first that their alleged Florida-related contacts are "completely unrelated to Plaintiffs' claims" and that Visit's Florida-based contacts are unrelated to the Plaintiffs' claims because Visit only markets hotels in Mexico, Jamaica, Brazil and the Dominican Republic. (Defs.' Mot., at 15.) Second, the Defendants believe that they did not purposefully avail themselves of conducting activities in Florida because the Florida-based reservations were a result of efforts by unrelated tour operators Cuban entities, and that "Defendants (and their affiliates or subsidiaries) never promoted the website or the ability to book accommodations at the Hotel Imperial through the Iberostar website in Florida or the U.S., nor did they target Florida or U.S. residents." (*Id.* at 24-25.) They also claim that they never received a direct or indirect financial benefit from the bookings in Florida. (*Id.* at 25.) The Defendants also argue that the iberostar.com's general legal notice does not amount to a waiver of personal jurisdiction. (Defs.' Reply, at 4-7.)

The Court concludes that the Defendants' Florida-related contacts are related to the Plaintiffs' claims such that they have purposefully availed themselves of doing business in Florida and as such the Defendants should have reasonably anticipated being brought into court here. Therefore, the Court will not discuss whether the effects test has been met. As discussed *supra* 3.A.2, the Florida bookings made through the Iberostar.com website—operated

by Visit on Iberostar's behalf—are, in part, the "the material communicated 'into' Florida [] that gives rise to the plaintiffs' trafficking claims under Title III and provides for specific jurisdiction under § 48.193(1)(a)(2)." *Del Valle*, 56 F. 4th at 1274. The Plaintiffs have specific evidence that Iberostar.com made reservations to the Imperial accessible in the United States and Florida. (Pls.' Resp., at 6 (citing, *inter alia*, ECF No. 163-5 (screenshots of the Imperial being marketed on Iberostar.com).)

In sum, the Defendants have the following Florida contacts that are related to the Plaintiffs' claims: (1) Iberostar.com is operated by a Florida-based entity, which conducts Iberostar's business with respect to Iberostar.com; (2) Iberostar.com marketed the Imperial on its website during the relevant time period; and (3) three non-United States residents used iberostar.com while in Florida to book their stays at the Imperial.[4] The Defendants have purposefully availed themselves of the privileges of doing business within Florida, and that business relates to the Plaintiffs' causes of action. *See Louis Vuitton*, 736 F.3d at 1358 (finding the purposeful availment test met where the defendant sold and distributed "infringing goods through his website to Florida consumers—*and the cause of action here derives directly from those contacts*") (emphasis in original).

The Defendants have additional Florida-related contacts. The Defendants do not dispute that seventeen Florida residents stayed at the Imperial during the relevant time period. They only dispute that fact's relevance, specifically that those seventeen residents booked their stays through Cubanacan's promotional efforts with "something Cubanacan called, 'Viajes Club Europa.'" (Defs.' Mot., at 13.) But this argument ignores the fact that Marcaribe, on Iberostar's behalf, entered into an agreement with Cubanacan to manage the Imperial Hotel, and that the agreement specifically references Iberostar. (FAC ¶ 16.) In other words, there is sufficient evidence that Cubanacan was acting on the Defendants' behalf to market the Imperial, and that that marketing led to a significant number of reservations originating from Florida residents. In fact, Marcaribe only has the state of residence for twenty-five of these patrons—and seventeen reside in Florida. (Pls.' Resp., at 9.) While the Court agrees with the Defendants that it cannot extrapolate a higher number of Florida residents from this percentage, Marcaribe's failure to maintain the residency of its U.S.-based guests should not inure to its benefit at the motion-to-dismiss stage.

---

[4] Because the Court finds that the Defendants have sufficient Florida-based contacts, the Court need not decide whether the general legal notice is relevant to its jurisdictional analysis.

#### 4. Fair Play and Substantial Justice

The burden now shifts to the Defendants to make a "compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Del Valle*, F. 4th at 1275. The Court must balance "(a) the burden on the defendant, (b) the forum State's interest in adjudicating the dispute, (c) the plaintiff's interest in obtaining convenient and effective relief, (d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (c) the shared interest of the several States in furthering fundamental substantive social policies." *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1251 (11th Cir. 2000) (citation omitted). The Defendants devote a mere three sentences to this prong, arguing that its corporate representatives are located in Spain or Cuba; most witnesses and evidence is located outside of Florida; and only one of the Plaintiffs resides in Florida. (Defs.' Mot., at 18-19.)

The Defendants have not made a "compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Del Valle*, F.4th at 1275. The Defendants' connections to Florida, which involve various transactions, make this case unlike that in *Future Technology*, in which the Eleventh Circuit found that it could not "conclude a strong state interest in haling people into Florida courts from all over the country for entering into *one service arrangement*, over the telephone without ever setting foot in Florida." *Future Tech.*, 218 F.3d at 1251 (citation omitted).

Therefore, the Court has specific personal jurisdiction over the Defendants.

#### 5. Rule 4(k)(2)

"[I]n cases where a defendant is not amenable to the jurisdiction of any state's courts of general jurisdiction, Rule 4(k)(2) allows a federal district court to exercise personal jurisdiction over a foreign defendant when (1) the claim at issue arises under federal law, and (2) exercising jurisdiction is consistent with the Constitution and laws of the United States." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1218 (11th Cir. 2009). Under Rule 4(k)(2), the relevant forum "is the United States as a whole." *Id.* (cleaned up).

The Court has already found that the Defendants are amenable to the jurisdiction of Florida's courts. As such, it will not engage in the Rule 4(k)(2) analysis. Therefore, the Court need not analyze the Defendants' supposed contacts with the United States and the parties' interesting arguments with respect to for example, Iberostar's use of trademarks in the United States.

The Court does note, however, Iberostar and Marcaribe's extensive United States contacts including, but not limited to, those discussed above as well as the 485 United States residents who stayed at the Imperial; the seven bookings on Iberostar.com made within the United States; Marcaribe's agreement with Expedia to market the Imperial in the United States which led to at least 26 bookings at the Imperial; and Visit's admission that it "engages in digital marketing and advertising of the Iberostar brand in the United States" and "finances the digital marketing and advertising in the United States of Iberostar products and services." (Pls.' Resp., at 22.). Like with Florida, the Plaintiffs have sufficient evidence that the Defendants created relationships with entities working in the United States that the Defendants knew would traffic the Imperial in the United States.

**B. Whether Iberostar Was Properly Served**

Iberostar believes that it was improperly served via e-mail with the FAC. In its motion, Iberostar cites to this Court's decision in *Hind v. FXWinning Ltd.*, Civil Action No. 23-23139-Civ-Scola, 2024 WL 2801521 (S.D. Fla. May 31, 2024), where the Court explained that Fed. R. Civ. 4(f)(3) "authorizes a court 'to order alternative means of service where a signatory nation [to the Hague Convention] has not expressly objected to those means.'" (Iberostar's Mot., at 20 (quoting *Hind*, 2024 WL 2801521, at *8).) Iberostar states that the e-mail service, which was approved by this Court, "will be rejected and sent back to the U.S. central authority . . . [and thus] will have no legal effect in Spain or under Spanish law." (*Id.*) The Court eventually received Spain's Central Authority's purported rejection of the e-mail rejection approved by the Court. (Letter from Spain's Central Authority, dated December 12, 2024, ECF No. 197.) In its reply, Iberostar also contends that Spain's Central Authority has rejected the Plaintiffs' attempted service of process by email multiple times. (Iberostar's Reply, at 2-3.)

The Court finds that Iberostar has been properly served. The Court previously granted the Plaintiffs' motion for alternative process. (Order Granting Mot. for Alt. Service of Process.) In that Order, the Court approved service of process by e-mail to Iberostar's general counsel, Alberto Llompart, as well as Iberostar's counsel of record in this case. (*Id.* at 1.) At that time, Iberostar never argued that Spain had rejected to service by e-mail. (*See generally* Iberostar's Resp. to Mot. for Alt. Service of Process, ECF No. 189.) Before granting the Plaintiffs' alternative means of process, Spain's Central Authority did not object to e-mail service despite it "object[ing] to service under the means listed in the Hague Convention," which does not include service by e-mail. (Order Granting Mot. for Alt. Service of Process, at 1.) Iberostar cites to

no authority that a rejection of service of process by a particular method has retroactive application as to merit overturning the law of the case.

Moreover, the Court authorized service of process by e-mail to Iberostar's counsel of record. (*Id.*) The Plaintiffs served Iberostar's counsel of record. (Notice of Filing.) Iberostar does not argue in the current motion that such service of process is invalid. Nor does it argue that Spain's Central Authority has rejected such service, assuming that it would even have the authority to do so.

"[C]ourts around the country have found that, in order to prevent delays in litigation, service upon foreign defendants through counsel is appropriate." *Fru Veg Marketing, Inc. v. Vegfruitworld Corp.*, 896 F. Supp. 2d 1175, 1182 (S.D. Fla. 2012) (collecting cases). As the Court has already explained, service of process through e-mail to Iberostar's counsel is, at the very least, reasonably calculated to provide Iberostar notice of the suit. (Order Granting Mot. for Alt. Service of Process, at 2.)

The Court finds no reason to deviate from its prior order granting alternative service through e-mail. Iberostar has been properly served with the lawsuit.

### C. Whether the Statute of Limitations Has Expired

The Defendants also argue that the Plaintiffs' claim is time-barred. (Defs.' Mot., at 24-25.) The Plaintiffs point out in their response that this Court has already held that the Plaintiffs' claims are not time-barred. (Pls.' Resp., 25-26 (citing Order Granting Leave to Amend, ECF No. 97, at 2).) The Defendants did not respond to the Plaintiffs arguments in their replies in support of their motions. Given the Court's prior decision, and that the Defendants have not provided any reason why the Court should depart from it, the Court finds that the FAC is not time-barred.

### D. Whether the Plaintiffs' Properly Amended their Complaint

The Defendants also argue that the Plaintiffs improperly amended their complaint because "the Federal Rules of Civil Procedure (in particular, Rule 15) do not allow an original plaintiff who lacked standing to amend its complaint by replacing the original plaintiff with six new plaintiffs and asserting different operative facts not present in the original complaint." (Defs.' Mot., at 30.)

The Court is somewhat confounded by this argument. First, the Court never adjudicated the Iberostar's arguments that Canto Marti lacked standing (and nor do the Defendants currently make that argument). The Court never adjudicated the Iberostar's past standing argument because Canto Marti, as

the original plaintiff, properly amended her complaint and mooted the motion to dismiss which raised that standing argument. Fed. R. Civ. P. 15(a)(1) allows a plaintiff *as a matter of course* to amend his or her complaint no more than twenty-one days after a responsive pleading, such as a motion to dismiss, is filed. Here, the Defendants filed their first motion to dismiss on January 11, 2023. (ECF No. 68.) Just twelve days later, Canto Marti filed an *unopposed* motion for extension of time to file her first amended complaint. (ECF No. 69.) The Court then granted Canto Marti's motion. (ECF No. 70.)

Second, the Defendants lack support for their broad proposition that a plaintiff who lacks standing cannot amend his or her complaint to add plaintiffs who have standing. The Defendants rely solely on *Summit Office Park, Inc. v. U.S. Steel Corporation*, 639 F.2d 1278, 1282 (5th Cir. 1981). (Defs.' Mot., at 30.) But that case is inapplicable both on the procedure and the facts. Procedurally, the plaintiff in *Summit Office Park* was not attempting to amend his complaint as of right within the time frame allowed after a responsive pleading was filed. *See Summit Office Park*, 639 F.2d at 1282. Instead, the plaintiff was seeking leave to amend years after the district court granted the defendant's motion to dismiss. *See generally id.*  And factually, in *Summit Office Park*, the "unique" "circumstances of th[e] case" left the plaintiff with "no way . . . [to] properly amend the complaint to give it a cause of action." *Id.* at 1282. The plaintiff "had no identity of interest with either the proposed plaintiffs, or the new class named in the complaint, or their cause of action." *Id.* The district court held that Rule 15(a) "does not contemplate the substitution of *an entirely new cause of action*, a new class, and new plaintiffs . . ." *Id.* (emphasis added). Moreover, "[t]here was no way in which the plaintiff could properly amend the complaint to give it a cause of action." *Id.*

Here, on the other hand, Canto Marti amended her complaint as of right to join the *other* real parties in interest. That is expressly allowed by Fed. R. Civ. P. 17(a)(3), which states that "[a]fter ratification, joinder, or substitution [of the real party in interest after an objection by the defendant], the action proceeds as if it had been originally commenced by the real party in interest."

Moreover, Canto Marti did not attempt to substitute in an entirely new cause of action. The Court has already explained that "[t]he amended complaint[s] raise[] essentially the same Helms-Burton claim relating to the same property in Cuba, but now Ms. Canto Marti asserts the claim in her own name and is also joined by five additional Plaintiffs asserting the same claim against Iberostar. (Order Requiring Joinder of Indispensable Parties, ECF No. 86, at 2.) The Court has also already granted leave to file the subsequent amended complaints. (*See* ECF Nos. 86, 97, 162.)

Therefore, this issue has already been settled. The Plaintiffs have properly amended their complaint.

**E. Whether the Plaintiffs Have Failed to State a Claim**

The Defendants also believe that the FAC fails to state a claim under the Helms Burton Act because the Plaintiffs do not allege that (1) they own the claim to the subject property or the Hotel Imperial; (2) any ownership of the claim by the Plaintiffs was acquired after March 12, 1996; and (3) the Defendants did not "knowingly and intentionally" traffic in the subject property. (Pls.' Mot., 25-29.)

1. Ownership of the Claims

"In the case of property confiscated before March 12, 1996, a United States national may not bring an action under [the Act] ... unless such national acquires ownership of the claim before March 12, 1996." *Gonzalez v. Amazon.com, Inc.*, Case No. 19-23988-Civ-Scola, 2020 WL 116912522, at *2 (S.D. Fla. March 11, 2020) (quoting U.S.C. § 6082(a)(4)(B)). "In other words, a United States citizen must already own the claim to the confiscated property on March 12, 1996 when the Act was passed." *Id.*

In making its arguments, the Defendants rely on extrinsic evidence that is appropriate for a motion for summary judgment rather than a motion to dismiss. (*See* Pls.' Mot., 26-27 (relying on exhibits purporting to explain Cuban and Puerto Rican law).) The Defendants argue that such evidence is appropriate because the Defendants are "rais[ing] a factual attack on subject matter jurisdiction" by contending that the Plaintiffs lack "standing" to bring its Helms-Burton Act. (*Id.* at 27 n.21.)

But the Defendants' arguments are intertwined with the merits of the Plaintiffs' claims. "When a defendant's standing argument attacks the merits of the plaintiff's claim, however, it is prudent to deny the motion without prejudice and decide the standing dispute at the summary judgment stage." *Avini Health Corp. v. BioGenus LLC*, Case No. 22-CV-61992-RAR, 2023 WL 2560844, at *2 (S.D. Fla March 17, 2023) (Ruiz, J.) (collecting cases). Taking the complaint as true and drawing inferences in the Plaintiffs' favor, the Court finds that the Plaintiffs state a claim under the Helms-Burton Act. The Plaintiffs allege, in detail, how and why they inherited ownership of claims to the confiscated property before March 12, 1996. (*See* FAC ¶¶ 96-102; 106.) All the Plaintiffs have been United States citizens before March 12, 1996. (*Id.* ¶¶ 107-18.) This is unlike *Gonzalez*, where the plaintiff, Gonzalez, failed to allege when he "inherited the claim from his grandfather, when Gonzalez

became a United States citizen, if Gonzalez's grandfather was a United States citizen, and, if so, when Gonzalez's grandfather became a citizen." *Gonzalez*, 2020 WL 1169125, at *2. As stated above, the Defendants arguments that the Plaintiffs did not, in fact, inherit ownership interests in the Subject Property are better addressed on a motion for summary judgment.

### 2. Notice of Trafficking

Moreover, under the Helms-Burton Act, "a person 'traffics' in confiscated property if that person knowingly and intentionally ... engages in a commercial activity using or otherwise benefiting from confiscated property." *Id.* (quoting 22 U.S.C. § 6023(13)). "[O]nly companies that will run afoul of this [] law are those that are knowingly and intentionally trafficking in the stolen property of U.S. citizens." *Id.* (citation omitted). "Knowingly" means actual "knowledge or having reason to know." 22 U.S.C. § 6023(9).

The Plaintiffs allege that the Defendants knowingly trafficked in two primary ways. First, the Plaintiffs argue that the Defendants received actual notice when Mario Canto, the original plaintiff, notified Iberostar—and therefore Marcaribe—of her intent to file suit, but Iberostar decided to continue trafficking in the Subject Property. (Pls.' Resp., at 29-30.) Second, the Plaintiffs argue that the Defendants had constructive notice because the subject property's confiscation was published in the Cuban newspaper "La Gaceta." (*Id.* at 30.)

The Plaintiffs' attempt to establish notice based on newspaper publication fails. The Plaintiffs' allegations are too general and do not reference the newspaper "La Gaceta." Instead, the Plaintiffs allege that "[i]n 1961, with the adoption of a series of Cuban laws published in the Cuban Official Gazette, the communist Cuban Government nationalized, expropriated, and seized ownership and control of the Subject Property without authorization from, or compensation to, the Subject Property's rightful owners, thereby confiscating the Subject Property." (FAC ¶ 145.) Therefore, the Plaintiffs allege, "a publicly available publication of the Cuban Government's confiscation of the Subject Property existed decades before Iberostar began trafficking the Subject Property." (*Id.*) However, "[i]t would be anomalous [] to institute in the instant case a presumption that a company has reason to know the consequences of a foreign law from *forty years earlier* that was relevant to its industry *but never applicable to the company itself.*" *Sucesores de Don Carlos Nunez Y Dona Pura Galvez, Inc. v. Societe Generale, S.A.*, 577 F.Supp.3d 295, 312 (S.D.N.Y. 2021); *see also Glev v. TripAdvisor LLC*, 529 F.Supp.3d 316, 332 (D. Del. 2021) ("The general knowledge that some properties in Cuba were confiscated more than

sixty years ago does not equate to constructive knowledge that the specific Subjected Properties involved in this case were confiscated. If it were otherwise, the knowledge element would be automatically satisfied for essentially any property located in Cuba, a proposition that is not consistent with the statute.").

This case is unlike *Iglesias v. Pernod Ricard*, 20-CV-20157-KMW, 2020 WL 13367465 (S.D. Fla. Aug. 17, 2020) (Williams, J.) where more detailed allegations regarding newspaper publication *combined* with specific "markings on materials" amounted to sufficient allegations of notice. *See Iglesias*, 2020 WL 13367465, at *10 (finding scienter was adequately pled where the plaintiff alleged that the "Defendant knew or should have known, because of the publication in Cuban newspapers and the markings on the materials, that the Cuban government had wrongfully confiscated such property from Cuban citizens"); *see also Iglesias*, 20-CV-20157, ECF No. 22 (Amended Compl.) ¶ 35 ("Specifically, in Cuba, Law 8902 was formally published in all newspapers noting confiscation [sic] of various areas of private property, segmented into 'Groupos' or groups.").

However, the Plaintiffs' second argument as to notice—notice of the potential suit—suffices under the Helms-Burton Act. "Several judicial decisions have held that the Act's scienter requirement is satisfied when a defendant receives a demand letter putting it on notice of its alleged Helms-Burton Act violation but nevertheless continues its course of conduct after the end of a thirty-day notice period." *Societe Generale*, 577 F.Supp.3d at 312 (citation omitted); *see also Trip Advisor*, 332-33 (finding that continued operations after the same notice period sufficiently alleged scienter).

Here, the Plaintiffs allege that after Canto Marti "timely provided Iberostar . . . written notice at least thirty days prior to commencing this action of [her] intent to commence the action," Iberostar "continued to knowingly and intentionally promote and traffic the Iberostar Imperial Hotel." (FAC ¶¶ 146-47.) Specifically, Iberostar allegedly continued to advertise the Imperial Hotel through Iberostarpro.com after Canto Marti's notice of alleged trafficking. (*Id.* ¶ 147 (citing ECF No. 163-22).) And because Marcaribe is Iberostar's wholly-owned subsidiary, the Plaintiffs also plausibly allege notice—and therefore scienter—with respect to Marcaribe.

The Plaintiffs thus sufficiently plead scienter, "at least for the post-notice period." *Trip Advisor*, 529 F. Supp. 3d at 332. And therefore, the Plaintiffs have stated a valid Helms-Burton claim.

**6. Conclusion**

For the foregoing reasons, the Court **denies** the Defendants' motions to dismiss. (**ECF Nos. 163, 193**.) The parties are directed to submit a proposed scheduling order no later than fourteen days after entry of this order.

**Done and ordered** at Miami, Florida, on January 17, 2025.

Robert N. Scola, Jr.
United States District Judge